**ANDREW M. CALAMARI**
**REGIONAL DIRECTOR**
**Lara Shalov Mehraban**
**Adam Grace**
**Jack Kaufman**
**Howard Kim**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0106 (Kaufman)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **17 Civ.      (   )** |
| **Plaintiff,** | **ECF Case** |
| **-against-** | **COMPLAINT** |
| **ARISTA POWER, INC., PETER KOLOKOURIS, WILLIAM A. SCHMITZ, MICHAEL T. HUGHES, JANICE PAPAPANU, MICHAEL PAPAPANU, EKATERINI KOLOKOURIS, DEMITRIOS KOLOKOURIS, ANASTASIOS KOLOKOURIS, IOANNIS "JOHN" KOLOKOURIS, SOPHIA KOLOKOURIS, TERRY BECHAKAS, 100 DEMETRIOS, INC., 200 ANASTASIOS, INC., 300 IOANNIS, INC., 400 TERRY, INC., 500 SOFIA, INC., JUST SELL GOLD, INC., AND EXPRESS GOLD CASH, INC.** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint

against defendants Arista Power, Inc. ("Arista"), Peter Kolokouris ("Kolokouris"), William A.

Schmitz ("Schmitz"), Michael T. Hughes ("Hughes"), and collectively the "Kolokouris Family

Traders," as follows: Janice Papapanu, Michael Papapanu, Ekaterini Kolokouris, Demitrios

Kolokouris, Anastasios Kolokouris, Ioannis "John" Kolokouris, Sophia Kolokouris, Terry

Bechakas, 100 Demetrios, Inc., 200 Anastasios, Inc., 300 Ioannis, Inc., 400 Terry, Inc., 500

Sofia, Inc., Just Sell Gold, Inc., and Express Gold Cash, Inc. (all defendants collectively

("Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      The Commission alleges two separate but related fraudulent schemes

concerning Arista Power, Inc. ("Arista"): (1) material misrepresentations and omissions in

certain Arista public Commission filings from September 2012 to November 2014 (the "false

statement period") concerning a purported $1.25 million "line of credit" or "loan agreement"

between Arista and an entity called TMK-ENT, Inc. ("TMK"); and (2) a scheme to manipulate

the public market price of Arista stock from approximately August 23, 2012 through January

25, 2013 (the "manipulation period"). The Commission charges: (1) defendants Arista, Schmitz,

Hughes, and Kolokouris with the first fraudulent scheme; (2) Kolokouris with orchestrating and

carrying out the second fraudulent scheme; and (3) Kolokouris and the Kolokouris Family

Traders with certain non-fraud liability related to the market manipulation scheme.

2.      During the manipulation period, Arista was a start-up alternative energy

company whose stock was quoted publicly on the OTCQB and traded publicly on the over-the-

counter market ("OTC Market") at prices ranging from $1.12 to $2.02 per share.

3.      Defendant Hughes was an experienced securities attorney who had provided

"consulting" and legal services to Arista and Kolokouris since at least 2008. According to  a

2009 letter from Arista to the Commission's Division of Corporate Finance, in 2008 both

Hughes and Kolokouris became "consultants" to Arista's predecessor corporation, WindTamer

Corp. (hereinafter collectively, "Arista"), "to assist in [Arista's] general development and

business structure to put [Arista] in the position to begin to commercialize its technology," and

2

Arista "granted [Hughes, Kolokouris, and another "consultant"] stock options as an incentive to assist [Arista] with business advice and strategy, since [Arista] did not believe it had the resources to hire outside consultants for cash." As of August 31, 2012, Hughes owned at least 408,000 shares of Arista stock, and his wife owned at least 50,000 shares.

4.      As of August 31, 2012, defendant Schmitz was Arista's Chief Executive Officer ("CEO"), drew a salary from Arista, owned at least 948,833 shares of Arista stock, as well as options to purchase at least an additional 75,000 shares.

5.      In 2008, Kolokouris received options to purchase over 15% of Arista's outstanding stock. As both Hughes and Schmitz knew by August 2012, Kolokouris had been barred by a federal District Court in 1990 from serving as an officer or director of a publicly traded company and from owning 5% or more of the securities of any such company. Apparently for this reason, in November 2008, Kolokouris had assigned his Arista stock options to certain Kolokouris family entities (which were among the Kolokouris Family Traders). At various times thereafter, those entities exercised their options and received millions of shares of Arista stock. In addition, at various times from 2008 through 2012, Arista issued additional significant amounts of its stock to certain Kolokouris Family Traders in private stock sales. As of August 2012, Kolokouris exercised control over the Kolokouris Family Traders' Arista stock.

6.      Defendants' two fraudulent schemes arose out of Arista's difficulty raising capital for its operations in the summer-fall-winter of 2012-2013. In late August 2012 – on the recommendation of defendants Hughes and/or Schmitz (who were working with Kolokouris) – Arista decided to raise short-term capital through private sales of Kolokouris family stock. As Hughes and Schmitz also knew and intended, at or about the time that those private stock sales occurred, Kolokouris caused Arista to receive cash that corresponded to the sales proceeds,

3

from bank accounts that Kolokouris controlled. Arista ultimately raised approximately $1 million for itself through those private stock sales.

7.    To effectuate the Kolokouris family Arista stock sales during the fall and winter of 2012-2013, Hughes and Schmitz (and another Arista consultant and a board member) – at Kolokouris' direction – pitched Kololouris family stock to various individual acquaintances of theirs. Hughes and Schmitz pitched the majority of those stock sales, which they offered at a significant discount to Arista's publicly-traded stock market price. As Hughes and Schmitz knew, Arista stock was thinly-traded (based on quotations on the OTCQB), and any negative public announcement regarding Arista likely would have lowered its public market price, thus impeding Hughes' and Schmitz's efforts to sell the Kolokouris family stock privately (particularly given that the privately-purchased stock was subject to a six-month lock-up period, during which time the purchasers could not sell).

8.    Schmitz and Hughes also believed in the fall of 2012 that Arista was legally required to disclose publicly its material influx of new capital. However, beginning on September 10, 2012, and continuing at various times through November 2014, to avoid potential negative publicity regarding Arista's source of funding, Schmitz and Hughes knowingly or recklessly caused Arista to make material false and misleading public statements and omissions regarding the source of the money Arista was raising, and had raised, through the Kolokouris family stock sales. Hughes drafted and/or reviewed the Arista public filings as its counsel, and Schmitz signed them as Arista's CEO. In those public statements, Arista falsely and misleadingly characterized the $1 million influx of Arista capital as the result of a "loan agreement" or "line of credit" from TMK, which appeared from those public statements to be an independent third-party lender.

4

9.       However, as Hughes and Schmitz knew or recklessly disregarded at that time, Kolokouris controlled TMK; TMK had no independent source of funds; TMK did not provide or even transfer any of the $1 million that Arista received; and the purported TMK "loan" was merely a fictitious cover for Kolokouris' financing of Arista through his family stock sales.

10.      Arista's public statements thus created the false impression for the public that an independent third-party lender was financing Arista, when in fact Kolokouris, an individual subject to a Commission bar, was furnishing the necessary financing by directing his family's stock sales. At no time did Arista, Schmitz, Hughes, or Kolokouris publicly disclose the true source of those funds (the Kolokouris family stock sales); at no time did defendants publicly disclose that receipt of those funds was contingent on sales of Arista stock; and at no time did defendants publicly disclose Kolokouris' or his family's involvement in raising that capital for Arista.

11.      The second fraudulent scheme described in this Complaint was Kolokouris' manipulation of Arista's public market (OTC Market) stock price, to help create the artificial appearance that private purchasers of Kolokouris' family's Arista stock were receiving a significant discount from its public market price. To support Arista's public market stock price during the manipulation period, Kolokouris executed manipulative stock transactions in certain of his family members' brokerage accounts. This manipulative trading fraudulently maintained and increased Arista's public market stock price through matched orders at prices above $1.00 per share and through other manipulative trading, including marking the closing price of Arista's stock on a number of trading days.

12.     The private sales of the Kolokouris family stock during the manipulation period was a significant stock distribution, which occurred at the same time that the Kolokouris Family Traders engaged in open market purchases of Arista stock on the OTC Market.

## VIOLATIONS

13.     By virtue of the conduct alleged herein, Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws, as follows:

14.     Arista:

(a)     Violated of Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)];

(b)     Violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and

(c)     Violated Section 13(a)(1) of the Exchange Act [17 U.S.C. § 78m(a)(1)], and Rules 12(b)-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. § 240.12b-20, 13a-1, 13a-11, and 13a-13] thereunder.

15.     Schmitz: Violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)]; and

16.     Hughes:

(a)     Violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)]; and

(b)     Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c)  [17 C.F.R. § 240.10b-5(a) and (c)].

17.     Kolokouris:

(a)     Violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §
77q(a)(1) and (3)];

(b)     Violated Exchange Act Sections 9(a)(1) and 9(a)(2), and 10(b) [15 U.S.C.
§§ 78i(a)(1), 78i(a)(2) and 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R.
§ 240.10b-5(a) and (c)]thereunder;

(c)     Violated Rule 102 of Regulation M [17 C.F.R. § 242.102]; and

(d)     Aided and abetted Arista's and Hughes's violations of Section 10(b) of
the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §
240.10b-5] thereunder.

18.     The Kolokouris Family Traders violated Rule 102 of Regulation M [17 C.F.R.
§ 242.102].

19.     Unless Arista, Schmitz, Hughes, Kolokouris, and the Kolokouris Family
Traders, are permanently restrained and enjoined, they will again engage in the acts, practices,
transactions and courses of business set forth in this Complaint and in acts, practices,
transactions and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

20.     The Commission brings this action pursuant to authority conferred by Section
20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Section 21(d)(1) of the Exchange Act [15
U.S.C. § 78u(d)(1)], seeking a final judgment: (a) restraining and permanently enjoining each of
the Defendants from engaging in the acts, practices, transactions and courses of business alleged
herein; (b) ordering Kolokouris and the Kolokouris Family Traders to disgorge all ill-gotten
gains and to pay prejudgment interest on those amounts: (c) imposing civil penalties on

7

Schmitz, Hughes, Kolokouris, and the Kolokouris Family Traders pursuant to Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)]; (d) ordering Hughes and Schmitz each barred from serving as an officer and director

of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and

Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) ordering Schmitz,

Hughes, Kolokouris, and the Kolokouris Family Traders barred from participating in any

offering of a penny stock pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. §

77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)]. Finally, the

Commission seeks any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

Securities Act Sections 20(b), 20(d) and 22(a) [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)], and

Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a)

of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C.

§ 78aa].  For example, certain of the investors who bought Arista stock on the public market

and in the private transactions at issue reside or are headquartered within the jurisdiction of the

Southern District of New York. Certain of the events constituting or giving rise to the alleged

violations also occurred in the Southern District of New York including, but not limited to

investor meetings and at least one wire transfer by an investor. The OTCQB, on which Arista's

stock was quoted, is headquartered in New York, N.Y.

23.     In connection with the conduct alleged in this Complaint, Arista, Schmitz,

Hughes, Kolokouris, the Kolokouris Family Traders, directly or indirectly, has made use of the

means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

## DEFENDANTS

24.     **Arista Power, Inc**. is the latest iteration of an entity incorporated in New York on March 30, 2001, and headquartered in Rochester, New York. Initially called Future Energy Solutions, Inc., and later, WindTamer Corp., the company initially purported to develop and sell wind turbines. In May 2011, WindTamer Corp. changed its name to Arista Power, Inc. WindTamer stock was first quoted publicly in November 2009, on the OTCQB (ticker WNDT). In May 2011, WNDT changed its name to Arista and its ticker symbol to ASPW. In December 2015, Arista filed a Chapter 7 Bankruptcy petition and is undergoing full liquidation. Prior to March 27, 2015, when Arista terminated its registration by filing a Form 15, the company's common stock was registered pursuant to Section 12(g) of the Exchange Act. Arista stock qualified as a penny stock because the stock was an equity security that did not meet any of the exceptions from the definition of a "penny stock" in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder. Among other things (1) Arista's common stock traded at less than five dollars per share during the false statements period; (2) Arista had net tangible assets of less than $2 million per year; and (3) Arista had average revenue of less than $6 million per year during its operating history.

25.     **William A. Schmitz**, 54, was Arista's President and Chief Executive Officer during the false statement time period.  He resides in Fairport, New York.

26.     **Michael T. Hughes, Esq.**, 47, is an attorney and became a legal consultant to Arista in or about July 2008. In or about July 2013, Hughes became Arista's General Counsel. Hughes resides in South Abington Township, Pennsylvania, is admitted to the New York and

9

New Jersey bars, and is a partner at the law firm of Schwell Wimpfheimer & Associates, LLP.

27.     **Kolokouris**, 64, resides in Avon, New York. In June 1989, Kolokouris was charged by the Commission in federal District Court with misappropriating proceeds from the initial public offering of North Atlantic Fisheries, Inc. ("NAF"), and with receiving illegal kickbacks from NAF's underwriter, *SEC v. Kolokouris, et al.*, 89-cv-0682-T (W.D.N.Y.). In a 1990 consent judgment, the Court in that case ordered Kolokouris to pay $2,130,315 in disgorgement and prejudgment interest; enjoined him from violating the anti-fraud, books and records, and reporting provisions of the federal securities laws; and barred him from being an officer or director of a publicly traded company and from owning 5% or more of the securities of any such company.

28.     **Ekaterini Kolokouris,** 62, is Kolokouris' wife.

29.     **Anastasios Kolokouris,** 33, is a son of Kolokouris and resides in Avon, New York. He is nominally the principal of the shell entity 200 Anastasios, Inc.

30.     **Demitrios Kolokouris,** 32, is a son of Kolokouris and resides in Salamanca, New York. He is nominally the principal of the shell entity 100 Demetrios, Inc.

31.     **Ioannis "John" Kolokouris,** 34, is a son of Kolokouris and resides in Salamanca, New York. He is nominally the principal of the shell entity 300 Ioannis, Inc.

32.     **Sophia Kolokouris,** 37, is a daughter of Kolokouris and resides in Avon, New York. She is nominally the principal of the shell entity 500 Sofia, Inc.

33.     **Terry Bechakas,** 47, is the son-in-law of Kolokouris and resides in Avon, New York. He is nominally the principal of the shell entity 400 Terry, Inc.

34.     **Janice Papapanu**, 71, is Kolokouris' aunt. She is the wife of Michael Papapanu and resides in Penfield, New York.

35.     **Michael Papapanu**, 73, is Kolokouris' uncle. He resides in Penfield, New York, and exercised control over Janice Papapanu's brokerage account.

36.     **100 Demetrios, Inc.** ("100 Demetrios") was incorporated on November 24, 2008, in New York, and its address is listed as 100 Main Street, Salamanca, N.Y. The principal of 100 Demetrios is nominally Demitrios Kolokouris. Kolokouris conducted some of the manipulative Arista stock trading alleged  in this Complaint through a brokerage account in the name of 100 Demetrios, as well as through brokerage accounts in the names of the other entities described below.

37.     **200 Anastasios, Inc.** ("200 Anastasios"), is a corporation whose address is listed as 5703 Eleni Court, Avon, New York, and was incorporated in New York on November 24, 2008. The principal for 200 Anastasios is nominally Anastasios Kolokouris.

38.     **300 Ioannis, Inc.** ("300 Ioannis") was incorporated on November 24, 2008, in New York, and its address is listed as 100 Main Street, Salamanca, N.Y. The principal for 300 Ioannis is nominally Ioannis Kolokouris.

39.     **400 Terry, Inc.** ("400 Terry") was incorporated on November 24, 2008, in New York, and its address is listed as 5722 Demitrios Way, Avon, N.Y. The principal for 400 Terry is nominally Terry Bechakas.

40.     **500 Sofia, Inc.** ("500 Sofia") was incorporated on November 24, 2008, in New York, and its address is listed as 5739 Demitrios Way, Avon, New York.

41.     **Express Gold Cash, Inc.** ("Express Gold") purports to be a precious metals dealer located at 100 Main Street, Salamanca, New York. Ioannis Kolokouris (a son of Kolokouris) is the principal of Express Gold. Demitrios Kolokouris was the trustee of a brokerage account in the name of Express Gold for which Ioannis, Sophia, and Ekaterini

Kolokouris had trading authorization.

42.    **Just Sell Gold, Inc.** ("Just Sell Gold") also purports to be a precious metals dealer, located at 5722 Demitrios Way, Avon, N.Y. Terry Bechakas is the principal and the trustee of a brokerage account in the name of Just Sell Gold for which Helen Bechakas (Terry Bechakas' wife), and Anastasios and Mary Beth Kolokouris (husband and wife) had trading authorization.

## FACTS

I.    **Arista False and Misleading Public Statements and Omissions**

43.    On August 30, 2012, Arista held a telephonic Board of Directors ("Board") meeting, attended by its three directors, its Board Chairman ("Chairman"), its Chief Financial Officer ("CFO"), Schmitz, and Hughes. The CFO was charged with recording the minutes of the meeting and, for this purpose, took handwritten notes during the meeting. Those notes indicate that, during the meeting, Hughes discussed the concept of Arista "founders shares" being sold "privately to loan" Arista funds; that Hughes, Schmitz, and another Arista associate already had "locked in aprox $200K" in such sales; and that Hughes and Schmitz planned to sell "up to $1 M[illion]" in stock.

44.    The following day, August 31, the CFO emailed to Hughes (for his review) the CFO's typewritten draft minutes for the August 30 Board meeting. The August 31 draft included the following description of the potential new Arista financing:

> Mr. Schmitz . . . explained, that . . . we are working on a financing plan with other [Arista] investors, who plan to sell a certain number of shares of [Arista's] stock, and will loan the proceeds from those private sales to [Arista]. Terms of the loan are being defined. There was a motion made by [Arista's Chairman] to allow Bill Schmitz and [the Chairman] to negotiate terms with the lender. [A Board member] seconded the motion and all were in favor.

45.      As Hughes and Schmitz knew or recklessly disregarded, the CFO's August 31

draft minutes' reference to "investors who plan to sell a certain number of shares of Arista

stock" was to Kolokouris family members. As of August 30, 2012, Hughes also knew or

recklessly disregarded – from, at the least, his own conversations with Kolokouris (of which he

had informed Schmitz) – that Kolokouris was to arrange the stock sales and cause the proceeds

to be sent to Arista. As evidenced by the August 21 draft Board meeting minutes, no person

who attended the August 30 Board meeting mentioned a loan by any third-party entity related to

the interim "financing plan," much less a loan from an entity called "TMK" – there was no

mention of TMK at the August 30 Board meeting.

46.      Ten days later, on September 10, 2012 , Arista filed publicly with the

Commission a Form 8-K (the "September 2012 8-K") that stated:

> On September 4, 2012, [Arista] entered into a Loan Agreement with TMK-ENT, Inc.
> (the "Lender") providing for a $500,000 working capital revolving line of credit for
> [Arista]. Advances under the Loan Agreement, which will be evidenced by a
> committed revolving credit note (the "Note"), bear interest at 10% per year, payable
> annually. The Note matures on September 4, 2013, and all borrowings under the
> Loan Agreement are due and payable on that date.
>
> As additional consideration for entering the Loan Agreement, [Arista] issued
> to the Lender warrants with a 10-year term to purchase an aggregate of
> 500,000 shares of common stock of [Arista] at $1.80 per share pursuant a
> Warrant Purchase Agreement (the "Warrant Purchase Agreement"). . . . The
> Lender is an accredited investor as defined under the Securities Act and
> Regulation D, was knowledgeable about [Arista's] operations and financial
> condition and had access to such information.
>
> ***
>
> The foregoing description of the Loan Agreement, Note, Warrant Purchase
> Agreement and Form of Warrant, and the transactions completed in
> connection therewith, do not purport to be complete and are qualified in their
> entirety by the full text of each agreement.

47.      Hughes drafted and reviewed the September 2012 8-K for Arista, and Schmitz

executed it as Arista's CEO, prior to its filing with the Commission on September 10.

48.     As Hughes and Schmitz knew or recklessly disregarded at the time of the September 2012 8-K filing, TMK was a Kolokouris-controlled entity, nominally owned and headed by a neighbor of Kolokouris, who deferred to Kolokouris on all matters involving TMK. In or about February 2011, at Kolokouris' request, Hughes had performed the legal work required to create TMK. Furthermore, neither Hughes nor Schmitz ever spoke with TMK's nominal owner – any communication that Hughes or Schmitz had with "TMK" during the false statement period was with Kolokouris.

49.     As Hughes and Schmitz knew or recklessly disregarded at the time, the September 2012 8-K was materially false and misleading in several respects, including the following. TMK never intended to, nor did it, loan $500,000 to Arista. Rather, as Hughes and Schmitz knew (and at least alluded to at the August 30 Arista Board meeting), Arista was to receive those funds through sales of Kolokouris family stock (pitched by Hughes and Schmitz). Furthermore, as Hughes and Schmitz knew, Kolokouris was to, and did, direct those private sales, and Kolokouris was to cause, and did cause, the funds to be sent to Arista from Kolokouris-controlled accounts.

50.     As Hughes and Schmitz also understood at the time, but fraudulently failed to disclose in the September 2012 8-K, the amount of funds Arista was to receive from the purported "TMK loan" was entirely contingent upon, and equal to, the amount of the Kolokouris family stock sales (and not on any actual TMK "loan agreement" or "line of credit"). Indeed, this fact was generally understood by Arista. In a September 23, 2012 email to Schmitz, copying Arista board members and Hughes, an Arista Board member asked, "With the 500k [credit facility] nearly complete, would it be possible if founding members would be

14

willing to sell more stock to increase the facility?"

51.     Furthermore, contrary to the false and misleading description in the September 2012 8-K, as of that time, neither Arista nor TMK had executed the purported "Loan Agreement," "Warrant Purchase Agreement," or "Note" described in the September 2012  8-K, and TMK had not received any such "warrants." As Hughes and Schmitz knew at the time, no such executed documents existed, and Arista and TMK did not finalize or execute such documents (if at all) until, at the earliest, October 2012. Furthermore, Hughes and Schmitz caused purported final, executed, versions of those documents – which Hughes drafted and Schmitz signed where necessary (on behalf of Arista) – to be back-dated to September 4, 2012, thus creating the false appearance that such final, executed versions of those documents had existed prior to the date of the September 10 Form 8-K filing.

52.     Furthermore, both Schmitz and Hughes understood at the time that any such purported "loan agreement" with TMK was not an actual arms-length agreement but, rather, merely a ginned-up "agreement" between Arista and Kolokouris-controlled entity TMK to cover up Arista's actual dealings with Kolokouris. Thus, for example, in an September 26, 2012 Hughes email to Arista's Chairman – attaching draft "TMK-ENT Credit Facility" documents – Hughes stated:

> Attached is the Arista Credit Facility and related note, as well as the warrant. It's very company friendly, with just a few real terms (barely) to make it arms-length.

53.     Beginning in or about August 2012 – as indicated in the August 31 draft Board minutes, and handwritten notes, of the August 30 Arista Board meeting – Hughes, Schmitz, another Arista "consultant," and an Arista Board member privately solicited their friends, family members, tennis club associates, and others to purchase Kolokouris-family Arista stock.

Kolokouris directed Hughes and Schmitz regarding which Kolokouris family members' stock to sell, what amounts of stock to sell, and at what price.

54.     As Hughes and Schmitz knew or recklessly regarded, as they effectuated those stock sales, Kolokouris caused funds equal to the stock sale proceeds to be transferred to Arista from bank accounts that Kolokouris controlled. Consistent with their understanding of this process, Schmitz and Hughes informed the private stock purchasers that the proceeds of their stock purchases were to go to Arista. Also, during the relevant period, Schmitz and Hughes reviewed and maintained an Excel spreadsheet titled "bridge financing," which tracked the Kolokouris family private stock sales as Schmitz and Hughes solicited buyers for the Kolokouris family. As Schmitz and Hughes knew and intended, the term "bridge financing" referred to the purported "TMK" loan that they falsely and misleadingly had reported to the public. Also, during the false statement period, Schmitz and Arista's CFO emailed each other numerous times concerning the Kolokouris family Arista stock sale proceeds and the manner in which those proceeds were being given to Kolokouris (for his further transfer of them to Arista).

55.     From September 2012 through February 2013, Hughes, Schmitz and Kolokouris raised a total of at least $984,700 for Arista through private sales of Kolokouris family stock, and they caused the proceeds of those sales to be given to Kolokouris.

56.     From September 2012 through February 28, 2013, Kolokouris transferred approximately $1,018,500 to Arista from bank accounts he controlled (or, at least, over which he had sufficient access), held in the name of Avon-Lima Road, Inc. (a Kolokouris-controlled entity); Kolokouris's sister, Vasiliki Vlaschou (who resides in Greece); and jointly held in the names of Kolokours family members Vasiliki Vlachou and Anastasios Kolokouris.

57.     Kolokouris transferred the $1,018,500 to Arista in the form of 13 cashier's

checks made payable to Arista and drawn on those bank accounts. Kolokouris apparently used cashier's checks to hide the true source of those funds. However, Kolokouris deceptively included on each cashier's check the handwritten notation, "TMK Enterprises," to create the false appearance that the checks were from TMK.

58.     Arista never repaid TMK (or anyone else) on its purported TMK loan. However, in January 2013, Arista transferred $35,000 back to Avon-Lima Road, Inc., thus reducing its total receipt of Kolokouris family stock sale proceeds to $983,500, almost precisely the amount of the private Kolokouris family stock sales that Hughes and Schmitz solicited ($984,700).

59.     During at least the time period that Kolokouris helped to raise capital for Arista through his private sales of his family's stock, Kolokouris knew or recklessly disregarded that Arista was falsely and misleadingly reporting publicly that the source of those funds was TMK.

60.     Like Hughes and Schmitz, others at Arista understood the actual source of the so-called "TMK" loan. Thus, Arista's CFO noted in an October 20, 2012 email, "we have gotten a line of credit from TMK Enterprises (Peter [Kolokouris] has agreed to sell some of his stock to other investors, and is lending us that money) – 10% interest – 1 year loan."

61.     On October 22, 2012, having not yet heard back from Hughes regarding the draft August 30 Board meeting minutes (which Arista's CFO had first sent to Hughes on August 31), Arista's CFO re-sent Hughes her August 31 draft Board meeting minutes and again asked Hughes to review them. Later that day, Hughes sent the CFO a revised version of the minutes, which falsely and deceptively mentioned for the first time "TMK" and scrubbed the minutes of any mention of "stock sales" related to the interim financing:

> Mr. Schmitz . . . explained that . . . [Arista] is attempting to secure
> financing $500,000 loan from TMK-ENT, Inc., a current shareholder of

[Arista]. Terms of the loan are currently being negotiated, but it was expected that the loan would have a term of approximately one year, have an annual interest rate of ten percent and that [Arista] would issue to the lender a warrant to purchase up to 500,000 shares of [Arista's] common stock at market price at the closing of the loan. The loan would not be secured by any of [Arista's] assets, and not guaranteed by any person.

After a discussion, a motion was made by [a Board member] and seconded by [another Board member], whereupon the following resolutions were unanimously adopted:

NOW THEREFORE, IT BE RESOLVED, the Company is authorized enter into an agreement or agreements (collectively the "Loan Agreements") with TMK-ENT, LLC ("TMK") in which [Arista] would borrow up to $500,000 from TMK, with an interest rate of no more than ten percent per year . . .

Hughes' October 22 version of the August 30 Board minutes went on to include additional purported Board resolutions concerning the purported Arista/TMK loan agreement.

62.     As Hughes knew, his October 22 revised version of the Board minutes deceptively and falsely: (1) included the concept of a "TMK" loan (including related Board resolutions), even though the Board had not discussed any "TMK" loan at its August 30 meeting; and (2) deleted any mention that the $500,000 was to be raised through the sale of Arista investors (or founders) stock. Hughes made these changes to conceal the Board's actual August 30 meeting discussion, in order to conform that discussion to Arista's false September 2012 8-K regarding the purported "TMK" loan. On or about October 24, 2012, after some additional changes, the Board adopted a final version of its August 30 meeting minutes, which likewise describes the fictitious "TMK" loan but makes no mention of Arista's raising capital for itself by selling Kolokouris family stock (or any other stock sales).

63.     As Arista's receipt of proceeds from the Kolokouris stock sales grew – after it issued its false and misleading September 2012 8-K – Arista, Hughes, and Schmitz continued to make similar false and misleading statements and material omissions regarding the purported

"TMK loan" in the following subsequent Arista public filings: Forms 8-K, dated November 16,

2012, December 26, 2012 and May 30, 2013 (falsely announcing increases in the amount of the

purported TMK loan, ultimately to $1,250,000); Forms 10-Q dated November 13, 2012, May

13, 2013, August 13, 2013, November 12, 2013, May 15, 2014, August 14, 2014, and

November 14, 2014; Forms 10-K dated March 28, 2013 and March 31, 2014; and Forms S-1

dated August 30, 2013, October 3, 2013, and April 30, 2014.

64.     Schmitz knowingly or recklessly signed all of the above false and misleading

additional Arista filings as Arista's CEO. Hughes at least reviewed for Arista (as its attorney)

the other Arista public filings listed above, and assisted in their filing, also knowing or

recklessly disregarding that they contained material false and misleading statements and

omissions as described in paragraphs 46-52 above.

65.     On or about March 31, 2014, Arista raised another $800,000 through an

additional private stock sale to an institutional investor, without disclosing to it the true nature

of the purported TMK loan.

66.     The false statements and omissions described in paragraphs 46-52 above,

regarding the purported TMK loan, were material for a number of reasons, including that:

(1) they created the false impression that a third-party lender was willing to loan money to

Arista; (2) no actual loan money was available but, rather, was contingent on consummation of

the private Kolokouris family stock sales; and (3) they hid the fact that a securities law violator

(Kolokouris) was instrumental in raising the $1 million in new capital for Arista.

## II.     **Kolokouris Manipulative Trading**

67.     Contemporaneously with the private stock sales directed by Kolokouris and

pitched by Hughes and Schmitz (the "Private Kolokouris Stock Sales"), Kolokouris caused a

number of much smaller public Arista stock purchases on the OTC Market through various accounts held in the names of the Kolokouris Family Traders (collectively, the "Public Kolokouris Stock Trades").

68.     The Public Kolokouris Stock Trades employed at least two forms of market manipulation – matched trading and marking the close. As used in this Complaint, a "matched trade" refers to a purchase and a sale of Arista stock on the OTC Market by two Kolokouris family brokerage accounts, where the purchase and sale were of substantially the same size and price, at substantially the same time, and were intended to raise or maintain artificially Arista's OTC Market stock price. As used in this Complaint "marking the close" refers to a Kolokouris family stock purchase on the OTC Market made at or near the end of the trading day, intended to raise or maintain artificially that day's Arista stock closing price. In addition to those two forms of manipulative trades, the manipulative Public Kolokouris Stock Trades also included trades earlier in the trading day that ended up being, and were intended to be, the last trade on that particular day, and were intended to raise or maintain artificially the stock's price. In addition, Kolokouris intended all three forms of manipulative trading to create the appearance of actual trading in Arista stock.

69.     From August 23, 2012 through January 25, 2013 (the manipulation period), through securities trading accounts held in the names of Kolokouris family members (or their entities), Kolokouris caused at least 38 matched trades, and at least 20 instances of marking-the-close (or similar manipulative trades).

70.      The Public Kolokouris Stock Trades had no economic purpose other than to support Arista's stock market price, to help induce and consummate the contemporaneous discounted Private Kolokouris Stock Sales. The mark-the-close trades cost the Kolokouris

family a total of, at most, only approximately $10,173. Although the matched trades totaled

$136,000, by their very nature, they did not constitute a net loss to the Kolokouris family

(because Kolokouris or one of his family members was both the buyer and seller on each

matched trade). Therefore the actual cost of Kolokouris' market manipulation scheme was, at

most, only a little over $10,000, a small fraction of the $1 million that Kolokouris raised for

Arista through the Private Kolokouris Stock Sales. The Kolokouris family had no economic

reason for engaging in simultaneous Public Kolokouris Stock Trades and Private Kolokouris

Stock Sales other than to deceive the private investors and general public into purchasing Arista

stock.

71.     Using on-line trading services, Kolokouris either placed the Public Kolokouris

Stock Trades himself or directed others to do so. Kolokouris caused the 38 matched-trades to be

made through multiple securities accounts held in the names of Sophia Kolokouris, Janice

Papapanu, 100 Demetrios, 200 Anastasios, 300 Ioannis, 400 Terry, 500 Sophia, Express Gold

Cash, and Just Sell Gold. Similarly, Kolokouris caused the 20 marking-the–close or similarly

manipulative trades to be made through multiple securities accounts held in the names of Janice

Papapanu, 100 Demetrios, 200 Anastasios, and 300 Ioannis.

72.     In the Private Kolokouris Stock Sales, Kolokouris sold Arista stock for

approximately $1 per share. During the same time period, Arista's OTCQB public market price

ranged from $1.12 to $2.02 per share. The Kolokouris manipulation scheme supported the

Private Kolokouris Stock Sales by creating the false appearance that those stock sales were

priced at a significant discount to the stock's public market price.

73.     Also as part of Kolokouris' market manipulation scheme, the Public

Kolokouris Stock Trades often constituted a significant percentage of Arista's daily OTCQB

trading volume, thus creating the false appearance for the public that higher demand existed for Arista stock than in fact existed.

74.     The following charts provide illustrative examples of Kolokouris' manipulative trading. The below chart shows the final public Arista trades on September 4, 5, and 7, 2012 (all caused by Kolokouris), at prices ranging from $1.75 - $1.80 per share. In each case, the Kolokouris stock purchase marked the close and raised Arista's OTCQB stock price from the OTCQB purchase immediately preceding it and, thus, artificially created a higher Arista closing OTCQB price for that day:

| Date | Buyer | Mark the Close Trade Time | Mark the Close Price | # Shares | Previous Trade Time | Previous Trade Price |
|------|-------|---------------------------|----------------------|----------|---------------------|----------------------|
| 9/4/2012 | Account of 200 Anastasios | 3:17:09 PM | $1.8 | 100 | 12:57:31 PM | $1.61 |
| 9/5/2012 | Account of Janice Papapanu | 3:49:43 PM | $1.8 | 250 | 3:47:32 PM | $1.75 |
| 9/7/2012 | Account of 200 Anastasios | 2:14:18 PM | $1.75 | 100 | 1:20:08 PM | $1.64 |

75.     Shortly after the above manipulative trades – on September 7 and 9, 2012 – Kolokouris caused two separate Private Kolokouris Stock Sales of his wife's Arista stock -- 20,000 and 50,000 shares, respectively – at the discounted price of $1 per share.

76.     The below chart shows a Kolokouris matched trade on November 5, 2012 (which also happens to have been the last trade that day). The Kolokouris matched trade likewise artificially raised Arista's OTCQB stock price from the price of the trade immediately preceding it:

| Date | Buyer/Seller | Matched TradeTime | Matched Price | #Shares | Previous TradeTime | Previous Price |
|------|-------------|-------------------|---------------|---------|--------------------|----------------|
| 11/5/2012 | Buyer: 200  Anastasios Inc.  Seller: 400 Terry | 1:23:08 PM | $1.76 | 100 | 1:13:18 PM | $1.66 |

77.     The following day, November 6, 2012, Kolokouris caused the Private

Kolokouris Stock Sale of 8,500 shares of Arista private stock held by Vasiliki Vlachou at $1 per

share.

78.     The stock sold in the Private Kolokouris Stock Sales was held in the names of

Ekaterini Kolokouris, Ioannis "John" Kolokouris, Demitrios Kolokouris, Anastasios

Kolokouris, and Vasiliki Vlachou. The Private Kolokouris Stock Sales were of significant

magnitude and effectuated through the special sales efforts of Hughes, Schmitz, Kolokoris and

others described herein. Through the Kolokouris Family Traders accounts, Kolokouris directly

or indirectly bid for or purchased Arista stock on the OTC Market at the same time as the

Private Kolokouris Stock Sales.

### FIRST CLAIM FOR RELIEF
**Fraud in Connection with the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Defendants Arista, Hughes, and Kolokouris)**

79.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 78, as if fully set forth herein. Defendants Arista,

Hughes, and Kolokouris directly or indirectly, singly or in concert, in connection with the

purchase or sale of securities and by the use of the means or instrumentalities of interstate

commerce or of the mails, or of the facilities of a national securities exchange, with scienter: (a)

employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material

fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

80.     By reason of the foregoing, defendants Arista directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

81.     By reason of the foregoing, defendants Hughes and Kolokouris directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

82.     Defendant Kolokouris, alternatively, aided and abetted Hughes' and Arista's violations of Exchange Act Section 10(b), and Rule 10b-5 thereunder, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**SECOND CLAIM FOR RELIEF**
**Fraud in the Offer or Sale of Securities**
**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**
**(Defendants Arista, Schmitz, Hughes, and Kolokouris)**

83.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 78, as if fully set forth herein.

84.     Defendants Arista, Schmitz, Hughes, and Kolokouris, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails knowingly, recklessly, and negligently (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would

24

operate as a fraud or deceit upon the purchaser.

85.     By reason of the foregoing, Defendants Arista, Schmitz, Hughes, and

Kolokouris, directly or indirectly, singly or in concert, have violated, and unless enjoined, will

again violate Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and

(3)].

**THIRD CLAIM FOR RELIEF**
**Reporting Violations**
**Violations of Section 13(a) of the Exchange Act and**
**Rules 12b-20, 13a-1, 13a-11, and 13a-13**
**(Defendant Arista)**

86.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 78, as if fully set forth herein.

87.     Defendant Arista filed false and misleading reports dated September 10, 2012,

November 16, 2012, December 26, 2012 and May 30, 2013 (Forms 8-K that announced the

purported TMK loan and subsequent announcement increasing the amount of the loan);

November 13, 2012, May 13, 2013, August 13, 2013, November 12, 2013, May 15, 2014,

August 14, 2014, and November 14, 2014 (Forms 10-Q); March 28, 2013 and March 31, 2014

(Forms 10-K). These filings were false and misleading because they failed to disclose the

related-party nature of the purported "TMK" loan and failed to disclose the true nature of the

financing.

88.     By reason of the foregoing, Defendant Arista violated, and unless enjoined,

will again violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20,

13a-1, and 13a-11thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-

13].

**FOURTH CLAIM FOR RELIEF**
**Matched Trading and Manipulative Trading**
**Violations of Section 9(a)(1), 9(a)(2), and 10(b) of the Exchange Act and Rule 10b-5**
**(Defendant Kolokouris)**

89.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 78, as if fully set forth herein.

90.     Defendant Kolokouris directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in a security other than a government security, or a false or misleading appearance with respect to the market for such security, entered orders for the sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, was entered by or for the same or different parties.

91.     Defendant Kolokouris directly or indirectly, effected, alone or with one or more persons, a series of transactions in securities registered on a national securities exchange, creating actual or apparent active trading in such securities, or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others.

92.     Defendant Kolokouris knowingly or recklessly traded Arista stock in order to match trades with the intent of manipulating the market for Arista stock.

93.     Defendant Kolokouris knowingly or reckless purchased Arista stock in order to create an appearance or trading activity to effect the price of Arista stock with manipulative intent.

94.     By reason of the foregoing, defendant Kolokouris, violated and unless enjoined

26

will again violate Exchange Act Sections 9(a)(1) and 9(a)(2), and 10(b) [15 U.S.C. §§

78i(a)(1), 78i(a)(2) and 78ij(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FIFTH CLAIM FOR RELIEF
**Sales During a Distribution**
**Violations of Rule 102 or Regulation M of the Exchange Act**
**(Defendants Kolokouris and the Kolokouris Family Traders)**

95.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 78, as if fully set forth herein.

96.     Defendants Kolokouris and the Kolokouris Family Traders directly and

indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in

connection with the distribution of securities of Arista, for which the Kolokouris Family

Traders who engaged in the Private Kolokouris Stock Sales were selling security holders, bid

for, purchased, or attempted to induce another person to bid for or purchase, such securities

during the restricted periods before they had completed their distribution.

97.     Defendants Kolokouris and the Kolokouris Family Traders have violated, and

unless restrained and enjoined will in the future violate Rule 102 of Regulation M of the

Exchange Act [17 C.F.R. § 242.102].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final

Judgment:

### I.

Permanently enjoining each of the Defendants from committing, aiding and abetting or

otherwise engaging in conduct that would make them liable for the violations of the federal

securities laws alleged in this complaint.

### II.

Ordering defendants Kolokouris the Kolokouris family traders to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts.

### III.

Ordering each of defendants Schmitz, Hughes, Kolokouris, and the Kolokouris Family Traders to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Ordering that defendants Schmitz and Hughes each be barred from serving as an officer and director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### V.

Ordering that defendants Schmitz, Hughes, Kolokouris, and the Kolokouris family traders be barred from participating in any offering of a penny stock pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)].

### VI.

Granting such other and further relief as the Court may deem just and proper.

Dated: June 19, 2017
       New York, New York

By:

Andrew M. Calamari
Lara Shalov Mehraban
Adam Grace
Jack Kaufman
Howard Kim
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0106 (Kaufman)
Email: KaufmanJa@sec.gov